758 N.W.2d 1 (2008)
276 Neb. 840
Stuart A. CARTER, Appellee,
v.
Nahoko Hata CARTER, Appellant.
No. S-08-025.
Supreme Court of Nebraska.
December 5, 2008.
*4 Susan Ann Koenig, Omaha and Jennifer J. Stevens, Senior Certified Law Student, of Koenig & Tiritilli, P.C., L.L.O., for appellant.
Christopher A. Vacanti, of Cohen, Vacanti, Higgins & Shattuck, Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
McCORMACK, J.

NATURE OF CASE
This case presents a dispute over whether Nebraska has jurisdiction over a child custody dispute under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA).[1] After living in Nebraska for about 3 years, Stuart A. Carter, his wife, Nahoko Hata Carter, and their 10-week-old son, Alexander Lee Carter (Alex), moved to Japan for approximately 2½ years during Stuart's permanent military duty assignment. At the end of his assignment, without warning or Nahoko's consent, Stuart took Alex to Nebraska and immediately filed for legal separation and custody. Nahoko, who is both a Japanese and an American citizen, argues that Nebraska is not Alex's home state and, therefore, does not have jurisdiction over the parties and the subject matter.

BACKGROUND
The facts of this case are generally not in dispute. Stuart was commissioned into the Navy through the Navy Aviation Officer Candidate School in Pensacola, Florida, and over the last 20 years he has served in a variety of locations. Stuart and Nahoko met in Japan while Stuart was stationed there, and they were married in Japan on November 11, 1994. After about a year, Stuart was reassigned. During their marriage, Stuart was assigned to several different locations, and Nahoko accompanied him. After living in Japan, Stuart and Nahoko moved to San Diego, California, where Stuart was assigned military duty. Stuart and Nahoko lived in San Diego for about 3 years; after that, they moved to Kansas because Stuart was assigned to the Army Command and General Staff College in Fort Leavenworth for 1 year. Stuart was then accepted to the School of Advanced Military Studies for another year in Fort Leavenworth.
In November 1999, Stuart and Nahoko moved to Nebraska, where Stuart was assigned to U.S. Strategic Command at Offutt Air Force Base. Alex was born in Nebraska on August 15, 2002.
In October 2002, when Alex was 10 weeks old, Stuart was assigned to a Navy *5 base in Yokosuka, Japan, and the family moved back to Japan. For the next 2½ years, Alex attended daycare in Japan, his first language was Japanese, and he formed bonds with his Japanese relatives.
In May 2005, Stuart's assignment ended and Stuart retired. Stuart and Nahoko had discussed where they should live during Stuart's retirement, and Nahoko was in favor of staying in Japan, while Stuart wished to move back to the United States. Stuart and Nahoko apparently had not yet reached an agreement on this point.
The military issued Stuart an order stating that he needed to go to San Diego for out-processing. It is unclear whether Nahoko knew of this requirement. Nahoko stated that Stuart had obtained Alex's passport from her, explaining that it was for a special visa that would allow Stuart to stay in Japan after his retirement. Stuart did not discuss with Nahoko the possibility of taking Alex with him on any trip to the United States.
On May 27, 2005, the day he left Japan, Stuart called Nahoko's mother, who usually picked Alex up from daycare, and told her he would be picking Alex up and taking him to lunch and then to the park. Nahoko testified that on May 27, she tried calling Stuart several times, but Stuart's telephone was off. Finally, at approximately 4 p.m., Nahoko received a text message from Stuart. The message was sent from the airport and stated simply, "ajevx [sic] is ok we are going to our ho me [sic] in usa m ore [sic] info later Stu."
Nahoko testified that she did not understand from this message exactly where in the United States Stuart might be taking Alex and that this took her by complete surprise. When Nahoko arrived home, she found that her key no longer opened the locks. Stuart admitted that right before leaving, he changed the locks on the family home. Stuart explained that he was concerned about Nahoko's destroying property.
The next day, Nahoko received an e-mail from Stuart stating that Alex was fine and telling Nahoko that she "should be looking for an Omaha-based attorney." The e-mail also warned Nahoko "not [to] take any irrational actions," because "wasteful spending or other negative actions could result in a less favorable settlement for you."
Stuart apparently first took Alex with him to his out-processing in San Diego. They then went on to Nebraska. From the time Stuart joined the Navy until his retirement in 2005, Stuart's home of record was Michigan. But during out-processing in San Diego, Stuart changed his home of record with the military from Michigan to Nebraska.
On May 31, 2005, almost immediately after arriving in Omaha, Stuart filed for legal separation and sought temporary care and permanent custody of Alex. On June 6, Nahoko left Japan to go to Omaha for the purposes of the child custody and legal separation proceedings. Nahoko filed a motion to dismiss the child custody case, based on the grounds that Nebraska lacked jurisdiction over the matter and over Alex. The court issued an order on November 3 denying the motion. The court concluded that Nebraska had jurisdiction, accepting Stuart's contention that he was ordered back to Nebraska at the end of his tour, and that Nebraska was Stuart's residence at all relevant times.
On February 28, 2006, the court issued a temporary custody order, again concluding that it had subject matter jurisdiction and jurisdiction over the parties. The court concluded it was in Alex's best interests for Stuart and Nahoko to have joint legal and physical custody. The court prohibited *6 either party from removing Alex from Nebraska without further order.
On March 29, 2006, Stuart amended his complaint for legal separation to dissolution of marriage. Nahoko filed her answer, again denying that the court had jurisdiction over the parties and the subject matter of the custody dispute, and she filed another motion to dismiss for lack of jurisdiction.
In her motion, Nahoko argued that the court's finding that Stuart had sufficient ties to the State of Nebraska was incorrect. Nahoko presented proof that Stuart's home of record was listed as Michigan throughout his military careerand not Nebraska as he previously alleged. However, the district court dismissed this motion on November 15, 2006, concluding that Nebraska was the home state and thus had jurisdiction over Alex. The court reasoned that Stuart had vehicles licensed in Nebraska, he had personal property left in Nebraska, and Alex was born in Nebraska.
Finally, on September 25, 2007, the court entered an order for dissolution of marriage, and the decree was entered on December 19. The court again found that it had jurisdiction over the parties and subject matter. It then found that both parties were fit and proper parties to have joint legal and physical custody and that neither party was entitled to attorney fees. On January 7, 2008, Nahoko filed her notice of appeal challenging the decree of dissolution of marriage for lack of jurisdiction.

ASSIGNMENTS OF ERROR
Nahoko asserts, restated and renumbered, three assignments of error. First, she asserts the district court erred in its application of the UCCJEA, resulting in the wrongful exercise of subject matter jurisdiction over the parties' minor child, because (1) Nebraska does not have jurisdiction to make an interstate custody determination; (2) Nebraska was not Alex's home state, because the 6-month requirement was not satisfied; (3) the years the parties lived in Japan do not constitute a temporary absence; and (4) Stuart's abduction of Alex was unjustifiable conduct.
Second, Nahoko argues that in the event we find the district court had jurisdiction, then the court erred by awarding the parties joint legal and physical custody of Alex by not adopting her proposed parenting plan, because it was in Alex's best interests.
Finally, Nahoko asserts the court erred in failing to award her attorney fees.

STANDARD OF REVIEW
In considering whether jurisdiction existed under the UCCJEA, when the jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from the trial court.[2]

ANALYSIS
Jurisdiction over a child custody proceeding is governed exclusively by the UCCJEA.[3] Jurisdiction over custody matters having interstate dimension must be determined independently by application of the UCCJEA.[4]
*7 The UCCJEA was enacted to serve the following purposes: (1) to avoid interstate jurisdictional competition and conflict in child custody matters, (2) to promote cooperation between courts of other states so that a custody determination can be rendered in a state best suited to decide the case in the interest of the child, (3) to discourage the use of the interstate system for continuing custody controversies, (4) to deter child abductions, (5) to avoid relitigation of custody issues, and (6) to facilitate enforcement of custody orders.[5] The UCCJEA treats a foreign country, such as Japan, as a state of the United States, unless the laws of the foreign country violate fundamental principles of human rights.[6] In this case, there is no allegation that Japan violates fundamental principles of human rights.
In order for a state to exercise jurisdiction over a child custody dispute, that state must be the home state as defined by the UCCJEA or fall under limited exceptions to the home state requirement specified by the act.[7] Under the facts of this case, for Nebraska to exercise initial jurisdiction over a child custody dispute, Nebraska must be the home state as defined by the UCCJEA.[8] The UCCJEA provides that a state has jurisdiction to make an initial custody determination only if
(1) this state is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.[9]
Stuart does not allege that any of the exceptions to the home state requirement are applicable here. Instead, he asserts that the district court properly exercised jurisdiction over Alex because, at the time of the filing, Nebraska was Alex's home state.
Home state of the child is defined in the UCCJEA as
the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.[10]
Statutory language is to be given its plain and ordinary meaning.[11] We first note that although Stuart emphasizes that portion of § 43-1227 which refers to children under 6 months of age, the statement that "[i]n the case of a child less than six months of age, [home state] means the state in which the child lived from birth" clearly refers back to the sentence preceding it and applies only to a child custody case involving a child under the age of 6 months of age at the time of the commencement of the proceedings.[12] *8 In other words, this clause was meant to provide a home state for a child when a custody proceeding is commenced at a time when a child has not lived in a state for the requisite 6-month periodbecause the child has not been alive for that period of time.[13] It is not meant to say that a child's state of birth is that child's home state.[14] Under the UCCJEA, regardless of where the child was born, if the child and his or her parents have been living in another state for the 6 months immediately preceding the commencement of a custody proceeding, then the state in which the child was born is not the child's home state under § 43-1227.[15]
As the Nebraska Court of Appeals emphasized in Lamb v. Lamb,[16] the plain and ordinary meaning of "home state" is the state where the child has "lived" with a parent or person acting as a parent for the 6 months immediately preceding the action.[17] But Stuart argues that the 2 years spent in Japan was only a "temporary absence" from Nebraska and that thus, under § 43-1227, Alex continued to live in Nebraska for well over the requisite 6-month period. Section 43-1227 states that "[a] period of temporary absence of any of the mentioned persons is part of the period." Thus, under the UCCJEA, a "temporary absence" should be counted as part of the 6 months during which the child must live in a state for it to be the home state.[18]
Stuart argues that the absence was temporary because it was due to a military assignment. We disagree. In the present case, the fact that Alex was in Japan because of Stuart's military obligations is of no consequence. The UCCJEA does not specifically address the meaning of "temporary absence" as used in § 43-1227. But it is clear that time spent living in another state or country due to a permanent military duty assignment is not considered a "temporary absence" simply because it was motivated by such assignment.[19]
In Consford v. Consford,[20] the child was born while her parents were on military assignment in Germany. When that assignment was completed several months later, the family moved to Texas to await the father's next military assignment. Less than 8 weeks later, the family moved to Arizona upon the father's military assignment there. Shortly after moving to Arizona, the parents separated and the mother and child went to Florida to stay with the child's maternal grandmother. The father continued living in Arizona. Five months after moving there, he filed for divorce in Texas, and the Texas court eventually entered a custody decree.
In the meantime, the mother and child had moved to New York, where the parties eventually disputed whether *9 the Texas custody decree was enforceable for lack of jurisdiction. The Supreme Court of New York, Appellate Division, ultimately held that Texas lacked jurisdiction as the child's home state despite the fact that the parents had chosen Texas as their legal domicile, had registered a vehicle there, and had filed their tax returns there before being moved to Arizona on military assignment. Although the move from Texas was compelled by a military assignment, the court held that time spent in Arizona could not be considered simply a temporary absence from Texas. The court explained: "Although an adult does not gain or lose a domicile or residence by serving in the military ..., the determination of a child's home state ... is separate and distinct from the determination of either the parents' or the child's legal residence...."[21] The court found simply that the family had functioned as a family unit in Arizona in a manner such that they "lived" there.
In the present case, we note that before moving to Japan for Stuart's last military assignment, Stuart and Nahoko had significant ties to Japan. Nahoko is a Japanese citizen and has family in Japan. Stuart and Nahoko were married in Japan, and they lived in Japan previously to living in Nebraska. When they moved back, they stayed for over 2 years, most of Alex's life at that time. Alex attended daycare in Japan, he established close family relationships with his Japanese grandparents, and his first language was Japanese. Under these facts, Alex's absence from Nebraska could not be considered simply "temporary." While their move to Japan was required by Stuart's military assignment, this is no different from any of the previous places the family had lived during their married life. In fact, the family lived in Nebraska only briefly prior to leaving for Japanbecause of Stuart's military assignment there. While Alex may have been under 6 months of age at the time they left, that fact does not change our analysis in this case.
The time spent in Japan is not considered a "temporary absence," and, therefore, it is clear that Alex was not living in Nebraska for the 6 months prior to the commencement of these proceedings. Thus, the district court did not have jurisdiction, and it should have granted Nahoko's motion to dismiss the child custody dispute.
Nahoko also assigns error to the district court's failure to award her attorney fees. The district court's decision on a request for attorney fees is reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion.[22] Although the district court did not have jurisdiction to decide the child custody case because Nebraska is not Alex's home state, we have the power to determine jurisdictional issues and to allow attorney fees and costs regarding litigation of such jurisdictional issues.[23] Based on our de novo review of the record, the district court abused its discretion in not awarding Nahoko attorney fees. Nahoko was forced to leave her home in Japan to defend this lengthy and meritless jurisdiction dispute. As such, we award $10,000 to Nahoko in attorney fees.

CONCLUSION
We conclude that the district court lacked jurisdiction over the child custody *10 dispute and that this court also lacks that same jurisdiction. We, therefore, vacate the district court's order relating to child custody and direct it to dismiss the child custody proceeding. We also award Nahoko attorney fees in the amount of $10,000.
REVERSED AND REMANDED WITH DIRECTIONS.
MILLER-LERMAN, J., participating on briefs.
NOTES
[1] Neb.Rev.Stat. §§ 43-1226 to 43-1266 (Reissue 2004 & Supp. 2007).
[2] Watson v. Watson, 272 Neb. 647, 724 N.W.2d 24 (2006).
[3] See Neb.Rev.Stat. § 42-351(1) (Reissue 2004).
[4] See, Dorothy v. Dorothy, 88 Ark.App. 358, 199 S.W.3d 107 (2004); Stevens v. Stevens, 682 N.E.2d 1309 (Ind.App.1997); 27C C.J.S. Divorce § 986 (2005).
[5] Uniform Child Custody Jurisdiction and Enforcement Act (1997) § 101, comment, 9 U.L.A. 657 (1999).
[6] § 43-1230.
[7] See § 43-1238.
[8] Id.
[9] Id.
[10] § 43-1227(7).
[11] Premium Farms v. County of Holt, 263 Neb. 415, 640 N.W.2d 633 (2002).
[12] See, In re D.S., 354 Ill.App.3d 251, 828 N.E.2d 1189, 293 Ill.Dec. 691 (2004); State ex rel. In Interest of R.P. v. Rosen, 966 S.W.2d 292 (Mo.App.1998).
[13] Id.
[14] Id.
[15] Paulsen v. Paulsen, 11 Neb.App. 582, 658 N.W.2d 49 (2003).
[16] Lamb v. Lamb, 14 Neb.App. 337, 707 N.W.2d 423 (2005).
[17] See, e.g., In re Marriage of Ben-Yehoshua, 91 Cal.App.3d 259, 154 Cal.Rptr. 80 (1979); Bergstrom v. Bergstrom, 271 N.W.2d 546 (N.D.1978).
[18] See, e.g., In re Marriage of Richardson, 255 Ill.App.3d 1099, 193 Ill.Dec. 1, 625 N.E.2d 1122 (1993).
[19] See, Consford v. Consford, 271 A.D.2d 106, 711 N.Y.S.2d 199 (2000); L.H. v. Youth Welfare Office, 150 Misc.2d 490, 568 N.Y.S.2d 852 (1991); Jackson v. Jackson, 390 So.2d 787 (Fla.App.1980).
[20] Consford v. Consford, supra note 19.
[21] Id. at 111-12, 711 N.Y.S.2d at 204-05 (emphasis supplied) (emphasis in original).
[22] Gangwish v. Gangwish, 267 Neb. 901, 678 N.W.2d 503 (2004).
[23] See In re Interest of J.T.B. and H.J.T., 245 Neb. 624, 514 N.W.2d 635 (1994). See, also, Carlson v. Carlson, 75 Ariz. 308, 256 P.2d 249 (1953).