2014 VT 32

# In re A.W., Juvenile

[94 A.3d 1161]

No. 13-375

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Burgess, J. (Ret.), Specially Assigned

Opinion Filed April 11, 2014

*Matthew F. Valerio,* Defender General, and *Rebecca Turner,* Appellate Defender, Montpelier, for Appellant Mother.

*Michael Rose,* St. Albans, for Appellant Father.

*William H. Sorrell,* Attorney General, and *Bridget C. Asay,* Assistant Attorney General, Montpelier, and *Jody Racht,* Assistant Attorney General, Waterbury, for Appellee.

¶ 1. **Dooley, J.** Mother and father appeal from a family court order adjudicating the minor A.W. to be a Child in Need of Care and Supervision (CHINS). They contend: (1) the court lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA); and (2) the evidence did not support the trial court's finding that the child was without proper parental care. We affirm.

¶ 2. The rather tangled background to this dispute may be summarized as follows. Mother and father were married and living in Enosburg, Vermont in January 2012 when mother became pregnant with A.W. Mother had struggled with substance abuse and mental health issues, which continued during the pregnancy. Father had a history of alcohol abuse. Based on concerns from its earlier involvement with mother's older children,[1] the Department for Children and Families interviewed mother during her pregnancy and learned of her continued use of alcohol. In April 2012, the police responded to two incidents involving mother and father, one in which mother allegedly assaulted father because she thought he was drinking too much, and the other in which both mother and father were found intoxicated in a hotel in St. Albans, Vermont, resulting in a charge against father for disorderly conduct.

¶ 3. In June 2012, the parents moved to Plattsburgh, New York, although mother maintained her medical care in Vermont at Fletcher Allen Health Care (FAHC). A.W. was born at FAHC on September 17, 2012. DCF made a report that day to the New York child protection agency in Plattsburgh expressing its con-

---

[1] Mother testified that her three older children all live with their fathers.

cerns about the parents' continued alcohol and possible drug abuse.

¶ 4. After two to three days in hospital at FAHC, mother was discharged with A.W., and the family went to father's parents' house in Swanton, Vermont before returning to their apartment in Plattsburg. About a week after A.W.'s birth, on September 25, 2012, the New York police responded to a dispute between mother and father. This led to mother's hospitalization for in-patient psychiatric care at the Champlain Valley Physician's Hospital in Plattsburgh.

¶ 5. While mother was hospitalized, father took A.W. to live with his parents in Swanton. The New York child protection agency, in response, advised DCF that there was an open case involving the family and requested that DCF contact father in Vermont. Two DCF caseworkers visited father at his parents' house in early October 2012. Father told them that he could not remain sober while he was with mother, and that he planned to live with A.W. at his parents' house. Over the next few days, DCF officials met with father and established a safety plan for the child in which father agreed to engage in substance abuse services and to apply for benefits to help support himself and the child at his new residence. Father also filed a relief-from-abuse complaint against mother in Vermont, and was issued a temporary order. Mother was released from the hospital after a few days and filed her own relief-from-abuse petition in New York, but testified that she intentionally failed to appear at the scheduled hearing so that it would be dismissed.[2]

---

[2] The date of dismissal of the relief-from-abuse petition is not evident from the record. While this appeal was pending, mother filed a request to supplement the appellate record, or alternatively to take judicial notice of certain additional documents relating to the New York proceeding, including: (1) a motion filed by mother in the New York family court, dated October 1, 2012, seeking custody of the child; (2) a supplemental affidavit by mother seeking "emergency custody"; and (3) a New York family court order of the same date directing the New York child-protective services agency "to conduct a child protective investigation." The State has opposed mother's motion, observing that the records were not brought to the trial court's attention in the proceedings below, and asserting that they do not affect the outcome in any event. While a Vermont family court is obligated to stay a proceeding and communicate with the court of another state if "information supplied by the parties" indicates that a child custody proceeding has been commenced in the court of another state having jurisdiction, 15 V.S.A. § 1076(b), that did not occur here; mother did not disclose that she had commenced such a

¶ 6. On October 5, 2012, DCF received information that father's substance abuse was continuing and filed a CHINS petition in response. A few days later, on October 8, 2012, mother and father appeared at the scheduled hearing on father's relief-from-abuse petition, where father had it dismissed. On the same day, the State filed a request for an emergency care order supported by a DCF social worker's affidavit stating that the child's grandfather in Swanton had reported that, following the relief-from-abuse hearing, the parents had returned home, picked up A.W., and left. The grandfather believed that they were returning to Plattsburgh. The grandfather stated that mother had behaved aggressively and that father may have been using drugs. The court, in response, issued an order finding that father had "stopped the safety plan that was necessary for the safety of the child," and transferred temporary custody to DCF pending a hearing scheduled for the following day. The parents did not appear at the hearing, and the court issued an order noting that the parents' and the child's "whereabouts [were] unknown," and that the State "suspects they have returned to New York." The court directed DCF to "prepare a temporary care order which will allow DCF to take custody in either state."

¶ 7. The child was taken into DCF custody the following day, October 10, 2012, in Vermont, where he was attending a medical appointment with mother. Following a hearing the next day, where both parents were represented, the court issued a temporary care order finding that the parents had been abusing drugs and alcohol, that returning custody to the parents would result in substantial danger to the health and safety of the child, and that temporary custody would remain with DCF. The child was placed with his paternal grandparents in Swanton, where he has since remained.

¶ 8. Shortly before the next scheduled hearing in December 2012, mother moved to dismiss the proceeding for lack of jurisdiction. Mother maintained that New York was the child's home state under the UCCJEA, and that there was no basis under the

proceeding, and the State was apparently unaware of any proceeding other than mother's petition for relief from abuse, which she testified had been voluntarily dismissed prior to the CHINS proceeding. Accordingly, we agree that the records in question do not affect our conclusion, discussed *infra*, that neither Vermont nor New York was the child's "home state" under 15 V.S.A. § 1071, and that Vermont has sufficient connections with the child to exercise jurisdiction. Therefore, we need not address the motion.

Act for an assertion of emergency jurisdiction in Vermont. In support of the motion, mother filed a letter from New York's child protection agency to mother, dated December 5, 2012, stating that she had been the subject of an investigation commenced on September 17, 2012, the date of A.W.'s birth, that some evidence had been uncovered to support a determination that the child had been maltreated or abused, and consequently that she would remain in the "New York State Child Abuse and Maltreatment Register" unless she requested an amendment or expungement. The State opposed the motion to dismiss, asserting that Vermont could exercise jurisdiction under the UCCJEA as either the child's home state, or on the basis that there was no home state, and Vermont had a significant connection with the family, or under the Act's provision for temporary emergency jurisdiction. The State subsequently filed a letter from New York's child protection agency, dated January 16, 2013, stating that its case concerning A.W. and his parents had been closed on November 14, 2012 because the child had been taken into DCF custody on October 10, 2012, and the child was residing with his paternal grandparents in Vermont. The State also filed a memorandum outlining the family's Vermont connections, including the fact that father had retained a Vermont driver's license and vehicle registration.

¶ 9. Following a hearing on the motion to dismiss in January 2013, the trial court issued a brief entry order, ruling that, while Vermont was not the child's home state, the court had properly exercised temporary emergency jurisdiction. The court also directed DCF to contact New York's child protection authorities to inquire about transferring the case, and set the matter for a further hearing "to monitor progress." The State, in response, filed a memorandum asking the trial court, presumably pursuant to 15 V.S.A. § 1068, to contact the New York State Family Court to determine whether a transfer would be in the best interests of the child. The court did not do so.

¶ 10. At the next scheduled hearing in March 2013, the State reported that the child remained with his grandparents in Swanton, that the parents remained in New York, and that the matter had not been transferred to the New York child protection agency. Mother asserted that any emergency giving rise to the transfer of custody had passed, and requested that the case be dismissed and custody returned to the parents. The State countered that the chaos surrounding the child at birth validated the

court's exercise of emergency jurisdiction, and that the circumstances justified retaining jurisdiction through to the merits hearing on the CHINS petition.

¶ 11. In response to these arguments, the court noted that there appeared to be no judicial proceeding in New York and no open case with the New York child protection agency, acknowledged the difficulties which the child's residence in Vermont posed for the parents, expressed the need for an "orderly transition" of custody to the parents, but ultimately remained reluctant to transfer custody or dismiss the case without more information about the parents' situation. The parties agreed to return at a follow-up hearing with more specific information regarding the parents' housing situation, employment, daycare arrangements, and the services in which they were enrolled.

¶ 12. At the next hearing in early April 2013, however, the court learned that father had since been incarcerated in New York on a domestic violence charge, that mother had moved from Plattsburgh to Norfolk, New York, that the extent of her participation in substance abuse and other services could not be verified, and that she had recently been a passenger in a vehicle which struck and killed a pedestrian. Mother restated her request for dismissal of the CHINS proceeding on jurisdictional grounds, while the State claimed that Vermont was the child's home state under the UCCJEA and that the matter should proceed to a merits hearing. The court declined to return custody to the parents, retained jurisdiction, and set the matter for a merits hearing.

¶ 13. The merits hearing was held in September 2013, and the court issued a written ruling that month, concluding that A.W. was CHINS. The court initially addressed the jurisdictional issue, ruling that it had emergency jurisdiction "when the petition was filed since A.W. was present in Vermont" and that, in the absence of any court proceeding in another state, its jurisdiction to rule on the merits had continued "by default." On the merits, the court found that A.W. had been without proper parental care since birth "due to the persistent and serious problems experienced by his parents with mental health, alcohol abuse, and domestic violence." Both parents have appealed.[3]

---

[3] Although mother and father have filed separate briefs, with one exception all of the principal claims are set forth in mother's brief, which father has joined.

¶ 14. We turn first to the parents' renewed assertion that the court lacked subject-matter jurisdiction. Because all events occurred after its effective date, this case is governed by the UCCJEA, 15 V.S.A. §§ 1061-1096, which replaced the Uniform Child Custody Jurisdiction Act (UCCJA).[4] Like the former law, the UCCJEA dictates when a court of this state has jurisdiction to decide child custody matters. The jurisdictional criteria "to make an initial child custody determination" are set forth in 15 V.S.A. § 1071, and include, in essence, four circumstances: (1) where "Vermont is the home state of the child on the date of the commencement of the proceeding" or Vermont "was the home state of the child within six months before the commencement of the proceeding and the child is absent from Vermont, but a parent or person acting as a parent continues to live in Vermont," id. § 1071(a)(1); (2) "[a] court of another state does not have jurisdiction" under (1) above, or "a court of the home state has declined to exercise jurisdiction on the ground that Vermont is the more appropriate forum" and a parent and the child have a significant connection with Vermont and substantial evidence is available in Vermont "concerning the child's care, protection, training, and personal circumstances," id. § 1071(a)(2); (3) "[a]ll courts having jurisdiction" under (1) or (2) above "have declined to exercise jurisdiction," id. § 1071(a)(3); and (4) "[n]o court of any other state would have jurisdiction under the criteria specified in" (1), (2) or (3) above, id. § 1071(a)(4).

¶ 15. In addition, the UCCJEA contains a provision authorizing a Vermont court to exercise "temporary emergency jurisdiction if the child is present in Vermont, and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." Id. § 1074(a). This section goes on to provide that, where "a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction," an order under this section becomes a final determination, "and Vermont becomes the home state of the child." Id. § 1074(b).

¶ 16. The parents here initially respond to the trial court's determination that it had "temporary emergency jurisdiction"

---

[4] The UCCJEA was enacted effective July 1, 2011. 15 V.S.A. § 1096. On the same date, the UCCJA was repealed. 2011, No. 29, § 8.

under 15 V.S.A. § 1074(a), arguing that § 1074(a) did not apply because A.W. was not "present in Vermont" when the court issued the emergency care order, and because the child was not "subjected to or threatened with mistreatment or abuse." *Id.* They also dispute that the court properly exercised continued jurisdiction to address the CHINS petition, arguing that a "child custody proceeding" had been commenced in New York, so that the Vermont court exercising emergency jurisdiction was required to contact the court in New York pursuant to § 1074(d).

¶ 17. We need not address these claims, however, inasmuch as we conclude that jurisdiction was otherwise properly established under § 1071 at the time the CHINS petition was filed on October 5, 2012. The trial court's jurisdictional ruling under the UCCJEA "is a question of law that we review de novo." *In re C.P.*, 2012 VT 100, ¶ 13, 193 Vt. 29, 71 A.3d 1142. Any factual findings by the court underlying its ruling are reviewed for clear error. *Pahnke v. Pahnke*, 2014 VT 2, ¶ 17, 195 Vt. 394, 88 A.3d 432; see also *Harignordoquy v. Barlow*, 2013 WY 149, ¶ 16, 313 P.3d 1265 (noting that while trial court's jurisdictional ruling under the UCCJEA is reviewed de novo, its underlying factual findings are reviewed for clear error); *In re Z.Z.*, 2013 UT App 215, ¶ 8, 310 P.3d 772 (same).

¶ 18. Like its predecessor, the UCCJEA defines "home state" to mean the state in which the child lived with a parent or a person acting as parent "for at least six consecutive months immediately" preceding the commencement of the proceeding, or "[i]n the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned." 15 V.S.A. § 1061(7); see also 15 V.S.A. § 1031(5) (repealed July 1, 2011). Periods of "temporary absence" by any of the mentioned persons are considered to be "part of" this six-month or less-than-six-months period. *Id.* We construed this definition of "home state" in *In re Cifarelli*, 158 Vt. 249, 611 A.2d 394 (1992), which involved a child who was born and lived in Bermuda for one month, was taken to New York for a brief period, and then moved with her family to Vermont. Because the child was not yet six months old when a guardianship proceeding commenced in Vermont, following the death of her parents, we concluded that the child effectively "ha[d] no home state" since she had neither lived consecutively in one state for six months nor "had she lived in any one state 'from birth' to the commencement

of the proceeding." *Id.* at 253-54, 611 A.2d at 397; see also *In re D.T.*, 170 Vt. 148, 152, 743 A.2d 1077, 1081 (1999) (holding that, with respect to a child less than six months old, "Vermont is not [the child's] 'home state' because he did not live in Vermont 'from birth' ").

¶ 19. The trial court here found, and the evidence showed, that A.W. was born in Vermont on September 17, 2012 and then returned to New York, where his parents had moved about two months earlier. As the court further found, about a week after A.W.'s birth, father took the child to his parents' house in Vermont with the stated intention of residing there and took steps to obtain benefits and services to support himself and the child in Vermont. Father and A.W. then lived in Vermont for almost two weeks before DCF filed a CHINS petition and emergency care request, at which point they returned briefly with mother to New York before the child was taken into custody in Vermont.

¶ 20. ▮ Thus, A.W. was barely three weeks old when the instant proceeding commenced, and had plainly not "lived from birth" in either Vermont or New York as this requirement was interpreted in *Cifarelli*. As noted, although the parents resided in New York when A.W. was born, father took the child to Vermont with the intention of residing there when the child was only a week old, applied for welfare benefits, committed to a safety plan for the child, and continued to reside in Vermont until the CHINS petition was filed about two weeks later. The facts as found by the trial court thus do not support a conclusion that the child had "lived from birth" in either New York or Vermont, and neither, therefore, qualifies as the child's home state under the UCCJEA.

¶ 21. Although the trial court here concluded that New York was the child's home state and that the time spent in Vermont was merely a "temporary absence" from New York, its factual findings do not support these conclusions. As noted, the question of what constitutes a child's home state under the UCCJA or its successor the UCCJEA is a question of law which this Court reviews de novo. *In re C.P.*, 2012 VT 100, ¶ 13. Furthermore, courts addressing the question of "temporary absence" have noted that the term is not defined under the UCCJA or its successor the UCCJEA, and many, therefore, have adopted a "totality of the circumstances" test, looking to whether all of the facts as found by the trial court, including the parent's purpose in removing the child

from one state to another and the duration of the absence, support a conclusion that a child's absence was temporary. See, e.g., *In re S.M.*, 938 S.W.2d 910, 918 (Mo. Ct. App. 1997) (holding that, in "resolving the temporary absence issue, the totality of the circumstances test is best" and concluding that, "[r]eviewing the totality of the circumstances, here, it is clear from the record that the three months which the children spent in Kansas . . . was a temporary absence"); *Chick v. Chick*, 596 S.E.2d 303, 308-09 (N.C. Ct. App. 2004) (adopting totality of circumstances test to determine whether absence from state was temporary under UCCJEA, and concluding that court's findings supported holding that absence was temporary).

¶ 22. Here, the court's findings that father brought the child to Vermont with the specific intent to reside here, and took additional, affirmative steps to establish residency in Vermont, including applying for welfare benefits and agreeing to follow a safety plan, are not reconcilable with its conclusion that the time period which the child spent in Vermont, up to and including the date of CHINS filing, was merely a "temporary absence" from New York. At best, it would appear that the circumstances and intentions of the parties fluctuated over a short period, and do not support a conclusion that either Vermont or New York was the child's home state.

¶ 23. Accordingly, we hold that neither Vermont nor New York meets the definition of A.W.'s "home state" under the UCCJEA, and we therefore turn to § 1071(a)(2) to determine whether there are sufficient family connections and evidence in Vermont for the courts here to exercise jurisdiction at the time of the CHINS filing. See *In re E.T.*, 137 P.3d 1035, 1042-43 (Kan. Ct. App. 2006) (holding that child under six months who was born in Missouri and later lived in Kansas "did not have a 'home state'" when the child protection proceeding commenced, and therefore the court must determine whether Kansas had sufficient connections and evidence to exercise jurisdiction); *In re R.P.*, 966 S.W.2d 292, 300 (Mo. Ct. App. 1998) (holding that infant who was born in Kansas and thereafter lived several months in Missouri had no "home state" under the UCCJA, and therefore court must look to which state had most significant connection and evidence concerning family). This is ultimately a legal issue we must resolve based on the facts as found by the trial court. See, e.g., *Hart v. Hart*, 327 S.E.2d 631, 636-37 (N.C. Ct. App. 1985) (holding that trial court's

factual findings were sufficient to support the conclusion that the children and at least one parent had sufficient connections with the state, and substantial evidence concerning their welfare, to support the exercise of jurisdiction).

¶ 24. ■ We conclude that Vermont's ties to this matter are sufficient to exercise jurisdiction. As the trial court found, when this proceeding commenced the child was residing in Vermont with his father and paternal grandparents. Father had applied for housing and other benefits in Vermont to help support himself and A.W. and had continued to retain a Vermont driver's license and vehicle registration. Father had entered into a safety plan with DCF in which he agreed to participate in a variety of services in Vermont. Thus the child and at least one parent had a significant connection with Vermont, and the most direct and best evidence concerning the child's day-to-day care and well-being at the time of the CHINS petition was in Vermont. Accordingly, we conclude that Vermont is the appropriate state to exercise jurisdiction.

¶ 25. ■ ■ For similar reasons we reject father's additional assertion that, even if the Vermont family court had jurisdiction, it should have declined to exercise it at the CHINS proceeding on the basis of forum non conveniens. See 15 V.S.A. § 1077(a) (stating that a Vermont court which has jurisdiction "may decline to exercise it" if it determines that it is an "inconvenient forum" and that "a court of another state is a more appropriate forum"). Initially, we note that neither parent sought to raise this issue "upon motion," as provided by § 1077(a). See *Follo v. Florindo*, 2009 VT 11, ¶ 15, 185 Vt. 390, 970 A.2d 1230 (noting that issue not raised at trial is waived on appeal). Moreover, although the parents reside in New York, the child's placement with his paternal grandparents in Vermont, his continued residence there during the intervening months, the evidence concerning his day-to-day care, the absence of any New York judicial child custody proceeding, and the trial court's understandable reluctance to dismiss the case with no plan in place for the child, all supported its retention of jurisdiction through the merits proceeding. See 15 V.S.A. § 1077(b) (providing that, in determining whether Vermont is an inconvenient forum, court shall consider "all relevant factors," including which state's exercise of jurisdiction may best protect the child, the nature and location of the evidence, and the familiarity of the court with the facts and issues in the litigation).

Accordingly, we find no abuse of discretion in the court's exercise of jurisdiction. *Rocissono v. Spykes*, 170 Vt. 309, 317, 749 A.2d 592, 598 (2000) (noting that the decision to decline jurisdiction under the UCCJA "is discretionary and thus subject to review under an abuse-of-discretion standard").

¶ 26. On the merits, the parents contend that the evidence was insufficient to support the court's determination that A.W. was without proper parental care. They assert, in particular, that the principal concern at the time of the CHINS petition and emergency care order was the possible presence of drugs or alcohol in the baby's system, and cite the State's concession that tests subsequently showed that this was not the case. They also assert that the trial court improperly relied on events occurring after the filing of the petition.

¶ 27. ■ The record shows, however, that the CHINS petition was predicated on a variety of risks apart from the possibility of drugs or alcohol in A.W.'s system. To be sure, the State's concerns resulted from a number of circumstances preceding the child's birth, including father's alcohol and drug use and mother's substance abuse and mental health issues, as well as a series of incidents involving public intoxication and domestic violence which resulted in criminal charges against both parents. The source of the concerns also included an incident when A.W. was about a week old in which the parents became involved in a physical dispute and father tried to pull the baby away from mother, resulting in police intervention and mother's hospitalization for mental health treatment, and more recently father's violation of the safety plan to which he had agreed by failing to attend substance abuse counseling and by continuing to use illegal drugs. The evidence introduced at the CHINS hearing substantiated these concerns, and showed that substance abuse and domestic violence continued to plague both parents. This was sufficient to support the court's conclusion that A.W. was "without proper parental care due to the persistent and serious problems experienced by his parents with mental health, alcohol abuse, and domestic violence." See *In re D.T.*, 170 Vt. at 156, 743 A.2d at 1084 ("The trial court's findings will stand unless clearly erroneous, and its conclusions of law will be upheld if supported by the findings.").

¶ 28. ■ The record further discloses that neither parent objected to the admission of evidence concerning matters occur-

ring after the CHINS petition; indeed mother affirmatively agreed with the court that it should consider events "up to the present date," and both parents attempted to show recent progress in addressing their substance abuse issues. Objections that are waived or not raised at trial are not preserved for review on appeal. *Florindo*, 2009 VT 11, ¶ 15. Accordingly, we find no basis to disturb the judgment.

*Affirmed.*

¶ 29. **Robinson, J.,** concurring. I concur completely in the majority's opinion. I write separately to make two points. First, the consequences of the delay in resolving the ongoing jurisdictional issues in this case could have been tragic. The CHINS petition was filed on October 5, 2012. The request for an emergency care order was filed on October 8, 2012, and the order issued shortly thereafter. Mother's first motion to dismiss for lack of jurisdiction was filed on December 4, 2012. The trial court subsequently issued several entry orders raising doubts about its own authority to continue to assert jurisdiction and urging the parties to take steps to initiate a proceeding in New York. However, the trial court did not on its own take steps to contact the New York court or courts in which the proceedings referenced in the parties' various pleadings were initiated, see 15 V.S.A. § 1074(d), and did not dismiss the action. The jurisdictional question was not definitively resolved by the trial court until September 17, 2013, nearly a year after the child was removed from his parents. During that year, the child lived with his paternal grandparents in Vermont, and parents' ability to demonstrate their compliance with DCF's requirements, and to build bonds with the child, were significantly constrained by geography and life circumstance. Had the trial court's earlier instincts that it lacked continuing jurisdiction proven correct, the trial court would have been in the position of removing the child from the only home and parent figures he had truly known for the first year of his life, and returning him to parents with whom he had visited weekly, but had not lived since he was three weeks old. If they deemed it appropriate, New York authorities would have then started the whole process from scratch.

¶ 30. Although the reason for nearly a full year's delay in deciding the question is not entirely clear from the record, it seems to be the result of a series of decisions, actions, and

inactions by the parties and the court rather than a single identifiable failing. Moreover, it is clear that the trial court acted, or refrained from acting, in part due to concern for the well being of the dependent child over whose welfare the court had ultimate decisionmaking authority. In the absence of a plan to provide for the child's welfare, the court was reluctant to simply dismiss the case. And, of course, as more time passed, the prospect of such a precipitous transition no doubt felt more untenable.

¶ 31. The Legislature has recognized the risk of dragging out these jurisdictional challenges, and has specifically instructed that "[i]f a question of existence or exercise of jurisdiction under this chapter is raised in a child custody proceeding, the question, upon request of a party, must be given priority on the calendar and handled expeditiously." 15 V.S.A. § 1065. Although it is not clear that the parties aggressively sought priority in scheduling, it is clear that the jurisdictional question in this case was not handled expeditiously.

¶ 32. This was not the first, and won't be the last CHINS case involving thorny issues under uniform child custody laws. See, e.g., *In re C.P.*, 2012 VT 100, 193 Vt. 29, 71 A.3d 1142 (CHINS case involving parents living in New York and child who had been staying with an aunt in Vermont prior to the CHINS petition). Going forward, I urge everyone in the process — the State, counsel for parents and children in CHINS cases, court staff, and judges — to be vigilant about bringing such jurisdictional questions to a speedy resolution.

¶ 33. My second point goes to father's argument that the trial court abused its discretion in failing to decline to exercise jurisdiction on the ground that Vermont is an inconvenient forum. 15 V.S.A. § 1077. For the reasons set forth in the majority's opinion, I believe the trial court's decision to exercise its jurisdiction was within its broad discretion. But I also want to emphasize that had the trial court dismissed this case on inconvenient forum grounds, I would have sustained that decision as well. A host of factors would have supported such a decision. The financial circumstances of the parties were such that travel to Vermont to participate in these proceedings was and is no doubt burdensome, *id.* § 1077(b)(4), and much of the evidence required to resolve the litigation was and is largely in New York, where the parents lived and availed themselves of services designed to improve their parenting capabilities, *id.* § 1077(b)(6).

¶ 34. More significantly, the decision to move forward in Vermont created an immediate obstacle to the goal of reunification — an obstacle the parents no doubt continue to face as this case has moved from merits to disposition. See 33 V.S.A. § 5101(a)(3) (stating that one purpose of juvenile judicial proceedings is to "preserve the family and to separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety"). Given the limitations of time, as well as financial and transportation limitations, parents' ability to travel to Vermont with the frequency necessary to build their relationship with their child is tenuous. They are no doubt expected to successfully engage in a host of services designed to address the issues that gave rise to this petition in the first place. The tasks associated with that critical personal work, combined with travel to and from Vermont to spend time with their child, could take up all their time and effort, leaving little capacity for employment, and steep barriers to success. That is not a recipe for smooth reunification.

¶ 35. I realize that the prospect of dismissing a CHINS petition, in the face of allegations that a child's welfare is at risk with his or her parents, may seem untenable. But I have confidence that Vermont is not the only state with attentive and concerned child protection professionals ready to take necessary steps to protect a child's well being. In fact, in this case the record reflects that New York's Department of Social Services (DSS) — New York's DCF analog — was well aware of this family. Although the record does not provide definitive evidence on this point, it appears that the reason the New York authorities discontinued their own engagement with this case was that Vermont had assumed jurisdiction.

¶ 36. Moreover, had the trial court decided to decline to exercise its jurisdiction, it could have ensured an orderly transfer by setting a date certain for its dismissal that left sufficient time for New York authorities to initiate a proceeding in that state and secure an interim order of some sort if they so desired. The trial court tried to do this at one point, ordering defendants to take action to transfer the case to New York and indicating that Vermont would maintain jurisdiction until that occurred. In the absence of a date certain for dismissal of the case, and given Vermont's continued retention of jurisdiction, it is disappointing but not surprising that New York's DSS apparently declined to initiate a proceeding in New York.