NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 80

No. 2017-095

In re M.S., Juvenile

Supreme Court

On Appeal from
Superior Court, Windham Unit,
Family Division

June Term, 2017


Katherine A. Hayes, J.

Matthew Valerio, Defender General, and Katina Francis Ready, Appellate Defender, Montpelier, for Appellant Father.

Adele V. Pastor, Barnard, for Appellant Mother.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Jody Racht, Assistant Attorney General, Waterbury for Appellee.

Michael Rose, St. Albans, for Appellee Juvenile.


PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Teachout, Supr. J., Specially Assigned


¶ 1.    **EATON, J.**    Mother and father separately appeal the family court's order terminating their parental rights to their son, M.S., born on January 12, 2015. On appeal, both parents argue that the court did not have jurisdiction. In addition, father argues that the court erred in (1) not immediately ordering genetic testing of father and proceeding with the merits hearing without his participation, and (2) at disposition, admitting New Hampshire orders terminating parents' rights to two older children. We affirm.

¶ 2. M.S. is parents' fourth child. He was born at a hospital in New Hampshire. The day of his birth, the State of Vermont filed a petition alleging M.S. was a child in need of care or supervision (CHINS) and seeking an emergency care order based on allegations that mother failed to get adequate prenatal care, parents' two oldest children, daughters, were in custody in New Hampshire due to parental neglect, and parents' next youngest child, a son, was in the custody of the Vermont Department for Children and Families (DCF) based on serious and unexplained physical injuries. The court issued an emergency care order on January 13, 2015, placing M.S. in DCF custody. On January 14, 2015, mother filed a motion to dismiss, arguing that Vermont lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 15 V.S.A. §§ 1061-1096. At a hearing on January 14, 2015, the court noted that it was authorized by the UCCJEA to issue an emergency order to protect the child, but set the matter for a contested hearing to resolve the jurisdictional issue. The court held an evidentiary hearing over two days in February and March 2015. In April 2015, the court issued a written order, concluding that the child did not have a home state and that Vermont could properly exercise jurisdiction due to its connections to the child and parents.

¶ 3. Although father was named in the CHINS petition, he was not definitively identified until genetic testing was complete and a parentage order was issued in June 2015. M.S. was placed in the same foster home as his older brother. He was adjudicated CHINS in August 2015. The initial case plan included recommendations for both parents, including obtaining substance-abuse and mental-health treatment, obtaining safe housing, obtaining domestic-violence counseling, attending visits, and engaging in parenting coaching. DCF sought termination at the initial disposition. Following a hearing, the court concluded that parents had made no progress, parents would not be able to parent in a reasonable period of time, and termination was in the child's best interests.

2

¶ 4.    Parents separately filed notices of appeal. On appeal, neither parent challenges the court's assessment of the child's best interests.

## I. Jurisdiction Under the UCCJEA

¶ 5.    We begin with mother's argument, which father joins, that under the UCCJEA Vermont lacked jurisdiction. The question of jurisdiction is a legal one that we review de novo. In re A.W., 2014 VT 32, ¶ 17, 196 Vt. 228, 94 A.3d 1161. We review the factual findings underlying the jurisdictional decision for clear error. Id.

¶ 6.    The UCCJEA defines the circumstances in which Vermont has jurisdiction to make an initial child custody decision. Id. ¶ 14. The primary basis for exercising jurisdiction is when Vermont is the home state of the child at the time the proceeding is commenced. 15 V.S.A. § 1071(a)(1). Among other possibilities, Vermont may also exercise jurisdiction if the child is without a home state and the child and at least one parent have "a significant connection with Vermont" and "substantial evidence is available in Vermont concerning the child's care, protection, training, and personal relationships." Id. § 1071(a)(2).

¶ 7.    Here, the trial court concluded that the child did not have a home state and that Vermont could exercise jurisdiction based on the connections to and evidence in Vermont. Mother argues that (1) the court's conclusion regarding home state was incorrect and that New Hampshire is the child's home state, and (2) Vermont lacks the necessary significant connection to exercise jurisdiction on that basis.

### A. Home State Jurisdiction

¶ 8.    The trial court made the following relevant findings. Mother was essentially homeless for several months in 2014, living at various times with relatives or friends in Vermont and New Hampshire. While pregnant with M.S., she was admitted to a hospital in New Hampshire in November 2014. She provided a social worker there with a Vermont address for purposes of

3

applying for assistance. In December 2014, mother was discharged and stayed with her grandparents and then other relatives in New Hampshire before M.S.'s birth in January 2015 at a hospital in New Hampshire. On the day of M.S.'s birth, the CHINS petition was filed in Vermont.

¶ 9. On appeal, mother argues that New Hampshire was M.S.'s home state and that New Hampshire therefore had jurisdiction over this proceeding. Mother emphasizes her connections to New Hampshire, including the various relatives she has in that state and the time she spent in New Hampshire prior to M.S.'s birth. She argues that she was not homeless prior to M.S.'s birth, but had established a legal residence in New Hampshire by staying in New Hampshire, obtaining a New Hampshire identification card, and intending to remain in New Hampshire after the child's birth. She contends that her connections to New Hampshire along with the child's birth in New Hampshire are sufficient to confer home-state jurisdiction.

¶ 10. The UCCJEA prioritizes jurisdiction based on the home state of the child in initial custody determinations. Ward v. LaRue, 2016 VT 81, ¶ 17, __ Vt. __, 150 A.3d 631. Under the UCCJEA, home state is defined as the state in which the child lived with a parent or person acting as a parent "for at least six consecutive months immediately" preceding the child custody proceeding, or for children under six months, "the state in which the child lived from birth" with a parent. 15 V.S.A. § 1061(7). Because the CHINS petition in this case was filed the day of M.S.'s birth, the question is whether M.S. "lived from birth" with a parent in a state such that that state was his home state. In construing this provision, we apply familiar rules of statutory construction and look first to the plain language of the statute. In re A.W., 2013 VT 107, ¶ 5, 195 Vt. 226, 87 A.3d 508. To resolve any ambiguity, we look at the statute as a whole and consider the statute's subject matter, effects, and consequences. Id.

¶ 11. Mother asserts that her legal residence, her intent regarding where she would live after M.S.'s birth, and the facts about where she resided for the six months prior to M.S.'s birth

4

are relevant to the home-state analysis. The statutory language defines home state as the state where the child "lived from birth." 15 V.S.A. § 1061(7). Two conclusions flow from the use of this language. First, the focus is on where the child was since birth. Where mother resided prior to M.S.'s birth is not relevant to determining M.S.'s home state.

¶ 12. Second, the word "lived" is different from resided or domiciled and we conclude that the Legislature used the word "lived" in the statute purposefully. See McMurphy v. State, 171 Vt. 9, 12, 757 A.2d 1043, 1046 (2000) ("We presume that language is inserted advisedly and that the Legislature did not intend to create surplusage."). As the Supreme Court of Texas explained, "[t]he word 'lived' strongly connotes physical presence" and "it [is] significant that the Legislature chose the word 'lived' as opposed to 'resided' or 'was domiciled.' " Powell v. Stover, 165 S.W.3d 322, 326 (Tex. 2005). Determining residence or domicile includes an inquiry into intent and using "live" avoids the complication of determining a child's home state " 'with inquiries into the states of mind of the child or the child's adult caretakers.' " Id. (quoting Escobar v. Reisinger, 64 P.3d 514, 517 (Tex. 2003)); see Slay v. Calhoun, 772 S.E.2d 425, 429-30 (Ga. Ct. App. 2015) (concluding that language "lived" in definition of home state refers to state where child is physically present, not state of legal residence); In re Marriage of Miller & Sumpter, 196 S.W.3d 683, 691 (Mo. Ct. App. 2006) (construing similar language of UCCJA and observing that appellate courts have concluded that language "lived" means "state of the child's actual physical presence, rather than the state of the child's legal residence or domicile"), abrogated on other grounds as recognized in Hightower v. Myers, 304 S.W.3d 727, 733 (Mo. 2010) (en banc). Using a more objective analysis furthers the purpose of the UCCJEA to make the initial jurisdictional decision a more straightforward determination. See Ward, 2016 VT 81, ¶ 17 (explaining that one aim of UCCJEA was to clarify that home state jurisdiction analysis should take primacy to make initial jurisdictional analysis more straightforward).

5

¶ 13.    We join several other states in holding that it is the child's physical presence—not a parent or child's residence, domicile or subjective intent—that is relevant to determining a child's home state.[1]   See, e.g., Ocegueda v. Perreira, 181 Cal. Rptr. 3d 845, 852-53 (Ct. App. 2015) (holding that parent's subjective intent to remain in state is irrelevant to determining where child "lives" for home-state analysis); Calhoun, 772 S.E.2d at 429-30 (explaining that " 'home state' is not synonymous with the residence or domicile of the parent having legal custody" (quotation omitted)); Dekinderen v. Dekinderen, No. 293443, 2010 WL 99269, at *3 (Mich. Ct. App. Jan. 12, 2010) (holding that child's physical location is central factor to determining home state, not residence or domicile); Carter v. Carter, 758 N.W.2d 1, 9 (Neb. 2008) (explaining that child's home state is separate from parents' or child's legal residence); In re Tieri, 283 S.W.3d 889, 893 (Tex. App. 2008) ("In determining where a child lived for the purposes of establishing home state jurisdiction, the trial court must consider the child's physical presence in a state and decline to determine where a child lived based on the child's or the parents' intent."). This is consistent with this Court's past cases, which have focused on the child's presence in the state to determine home state, and held that if the child has a home state, that state has jurisdiction to make an initial decision regarding custody regardless of the parents' connections to the state. See In re D.T., 170 Vt. 148, 152, 743 A.2d 1077, 1080-81 (1999); see also In re R.W., 2011 VT 124, ¶ 31, 191 Vt. 108, 39

---

[1]  The statute explains that in determining home state "[a] period of temporary absence" is included in the period.  15 V.S.A. § 1061(7).  While the determination of whether a child "lived" in a state involves an objective test dependent on the child's physical presence and not based on subjective intent, this is different from the question of whether a period outside the state qualifies as a "temporary absence," which is determined by looking at the totality of the circumstances.  In re A.W., 2014 VT 32, ¶ 21; see In re S.M., 938 S.W.2d 910, 918 (Mo. Ct. App. 1997) (holding that in Missouri temporary absence under UCCJA is resolved by examining totality of circumstances); Chick v. Chick, 596 S.E.2d 303, 308 (N.C. Ct. App. 2004) (adopting totality-of-the-circumstances test to determine if absence from state amounted to "temporary absence" under UCCJEA).

A.3d 682 (explaining that child's home state has jurisdiction to adjudicate status of child "even if the parents lack minimum contacts with the forum").

¶ 14.    Therefore, to determine M.S.'s home state, we look to where he was physically present since birth.  He was born in New Hampshire and remained in the hospital at the time the petition was filed, but these facts alone do not make New Hampshire M.S.'s home state.  Although, as explained above, "lived" as used in the statute connotes physical presence, the statutory language defines home state as more than just the place the child was present.  The statutory language is plain: the home state for a child under six months is the place the child "lived from birth" with a parent or person acting as a parent.  15 V.S.A. § 1061(7).  We conclude that by adding the requirement that the child live with a parent or person acting as a parent, the Legislature meant "lived" to mean more than simply being alive in the state.  "When people speak of where a mother and newborn baby 'live,' they do not speak of the maternity ward," but of the place where the child and parents occupied a home.  In re D.S., 840 N.E.2d 1216, 1222 (Ill. 2005).  We agree with courts from other jurisdictions that a short hospital stay incident to birth does not amount to "liv[ing] from birth with" a parent and does not in itself confer home state jurisdiction.[2]  See, e.g., In re R.L., 208 Cal. Rptr. 3d 523, 533-34 (Ct. App. 2016) (holding that under UCCJEA "a temporary hospital stay in a state incident to birth, by itself, is insufficient to confer home state jurisdiction"); In re D.S., 840 N.E.2d at 1222 ("By itself, a temporary hospital stay incident to delivery is simply

---

[2]  Contrary to the concurrence's assertion, this does not mean that the child's presence in New Hampshire is "irrelevant," post, ¶ 38 n.10, or that a child will not have a home state "until he or she sleeps in a bed outside the hospital," post, ¶ 37.  Because the statute defines home state as the place where a child has lived with a parent, the child's presence in a state is certainly relevant, but mere presence is not enough.  The child must be living in the state with a parent.  There may be situations where a child is living with a parent while still in the hospital, but we need not determine in the context of this appeal what facts would suffice.  Here, M.S. had not been to Vermont and following his birth in New Hampshire he was in the hospital for less than a day before the petition was filed.  Under these facts, there was no state in which M.S. had lived with a parent since birth.  Therefore, he did not have a home state.

7

insufficient to confer 'home state' jurisdiction under the UCCJEA."); In re Adoption of Baby Girl B., 867 P.2d 1074, 1079 (Kan. Ct. App. 1994) (explaining that statutory home state "requirement that the child 'live with' the mother from birth requires more than the mother and newborn child staying at the same hospital for a brief period"), superseded by statute, K.S.A. 59-2127, as recognized in In re Adoption of H.C.H., 304 P.3d 1271, 1280 (Kan. 2013). Here, the petition was filed the day of M.S.'s birth and we conclude that the short period of time that M.S. was in the hospital in New Hampshire following his birth did not confer home state jurisdiction.

¶ 15. We also conclude that Vermont was not M.S.'s home state. Again, we begin with the statute's plain language, which defines home state as the place where a child lived from birth. As explained above, "lived" as used in the statute means where the child is physically present and is different from the parents' residence or domicile. See In re Calderon-Garza, 81 S.W.3d 899, 901 (Tex. App. 2002) (holding that Texas was home state of child born there and brought to Mexico day before proceeding commenced, even though mother was resident and citizen of Mexico); B.B. v. A.B., 916 N.Y.S.2d 920, 923-24 (Sup. Ct. 2011) (holding that child's home state was Minnesota, where child was born and continued to reside at time case was filed, even though parties had lived in marital residence in New York up until mother was seven-months pregnant). M.S. had never been physically present in Vermont at the time the petition was filed and therefore Vermont was not his home state.[3] See In re D.T., 170 Vt. at 152-53, 743 A.2d at 1080-81 (concluding under UCCJA, which defined home state similarly, that Vermont was not home state

---

[3] The concurrence asserts that Vermont could be the home state of a child, who had never been to the state, but was born to parents who resided in Vermont for a long time. Post, ¶ 48. The statutory language does not support this assertion; the language focuses on where the child lives with the parents, not where the parents have lived. For this reason, courts have held that a baby, who is born in one state and within days transported to another state, simply has no home state. Carl v. Tirado, 945 A.2d 1208. 1209-10 (D.C. 2008) (per curiam).

of ten-week old child born at hospital in Massachusetts and then brought to Vermont because child had not lived in Vermont from birth).

¶ 16.    Therefore, M.S. did not have a home state when the proceeding was commenced and jurisdiction could not be exercised on this basis.  See In re A.W., 2014 VT 32, ¶ 20 (concluding that three-week-old child born in Vermont, transported to New York, where parents had resided prior to child's birth, and brought back to Vermont did not have home state because he had not "lived from birth" in either state); Carl, 945 A.2d at 1209-10  (construing requirement from UCJA that child live from birth in given state "strictly" and concluding that child born in Maryland and transported to mother's home in Virginia at four days old did not have home state).

B.  Significant Connection Jurisdiction

¶ 17.    Under the UCCJEA, when a child does not have a home state, Vermont can assert jurisdiction if the child and at least one parent "have a significant connection with Vermont other than mere physical presence" and "substantial evidence is available in Vermont concerning the child's care, protection, training, and personal relationships."  15 V.S.A. § 1071(a)(2)(A), (B).

¶ 18.    Here, the court found that significant connection jurisdiction existed in January 2015 when the petition was filed based on the following facts.  Mother and father's two eldest children were in Vermont DCF custody in 2008.  Subsequently, the children were reunified with parents, and after the family moved to New Hampshire, the children were placed in the custody of the New Hampshire Division of Children, Youth and Families (DCYF).  Mother and father's third child, B.S., born in September 2013, was placed in Vermont DCF custody in January 2014 after DCF became aware that he had a fractured tibia and two fractured vertebrae and no explanation for the injuries.[4]  At that time, father lived with his parents in Vermont and mother lived with her

---

[4] In July 2014, the Vermont court found B.S. was CHINS based on the severe unexplained physical injuries that occurred while in parents' sole care.  The court subsequently terminated parents' rights and this Court affirmed.  In re B.S., No. 2015-155, 2015 WL 4643608 (Vt. July 24,

9

mother in Vermont. Except for the year he lived in New Hampshire, father is a lifelong resident of Vermont.

¶ 19. Mother continued to live in Vermont for a short time after B.S. was removed from her care and was then essentially homeless for several months, during which time she stayed with friends and family in Vermont and New Hampshire, including staying with father at his parents' home and sleeping in his car. During her period of homelessness, mother continued to use a Vermont address as her mailing address. Mother was hospitalized in New Hampshire in November 2014 and provided the hospital her Vermont address. When she was discharged from the hospital, in December 2014, she stayed with relatives in New Hampshire until shortly before M.S.'s birth. Based on these findings, the court concluded that there was a significant connection to Vermont and substantial evidence in Vermont concerning parental fitness because there was a child-neglect proceeding pending in Vermont regarding M.S.'s older brother.

¶ 20. Mother argues that the court's determination is in error, asserting that New Hampshire had "more [] substantial evidence than Vermont." While mother might have also had connections to New Hampshire, these connections did not preclude an exercise of jurisdiction by Vermont. As we recently explained, to exercise significant connection jurisdiction does not require a finding that Vermont has the most significant connection, just that there is a significant connection.[5] Pierce v. Slate, 2017 VT 63, ¶ 23, __ Vt. __, __ A.3d __. The relevant issues are

_____

2015) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents/eo15-155.pdf [https://perma.cc/CZ79-QNGW].

[5] In In re A.W., 2014 VT 32, this Court concluded that Vermont had significant connection jurisdiction, reciting the ties to Vermont and concluding that "the most direct and best evidence concerning the child's day-to-day care and well-being at the time of the CHINS petition was in Vermont." Id. ¶ 24. To the extent this statement implies that Vermont must have the most evidence or the best connection to exercise significant connection jurisdiction, we clarify that that is not the test.

whether there was a significant connection to Vermont and whether there was substantial evidence in Vermont relevant to the child's care. See 15 V.S.A. § 1701(a)(2).

¶ 21.    The record supports the court's findings concerning the parties' connections to Vermont.[6] Those findings demonstrate that both mother and father had a long history in Vermont. Mother had relatives in Vermont with whom she had recently lived, including during her pregnancy. Mother had a long-term relationship with father, who was a resident of Vermont, and she had lived with father for at least part of her pregnancy.[7] M.S.'s older brother was in the custody of Vermont DCF following serious unexplained physical injuries and there were ongoing proceedings in Vermont concerning that child's welfare. These connections to Vermont and this

---

[6] The sole finding that mother challenges is that she was homeless prior to M.S.'s birth, instead asserting that she was a resident of New Hampshire. On appeal, we will uphold findings of fact unless clearly erroneous and will defer to the family court's determinations of weight and credibility. In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993). The record supports the court's finding that mother was homeless. Mother testified that she stayed in various locations prior to M.S.'s birth, some in New Hampshire and at least two locations in Vermont—her brother's home and father's parents' home—and when questioned mother explained that she had been staying with various relatives, but was essentially homeless. Although mother made other statements regarding her living situation, this evidence is sufficient to support the court's finding that mother was homeless prior to M.S.'s birth. Moreover, this fact was not determinative. Even if mother had presented enough evidence to demonstrate that she was a legal resident of New Hampshire prior to M.S.'s birth, this would not have changed the jurisdictional analysis. As explained above, the determination of mother's legal residence is different from M.S.'s home state. In addition, there remained a significant connection to Vermont and evidence in Vermont regarding the safety and care of M.S.

[7] At the time of the hearing on the motion to dismiss, father had not legally been recognized as M.S.'s parent. In its jurisdictional decision, the court credited mother's testimony that father was the likely biological parent and considered the fact that father is a life-long resident of Vermont in evaluating the connections to Vermont. On appeal, mother contends that she was the only recognized legal parent at the time and therefore father's connections should not factor into the determination of jurisdiction. We need not reach the question of whether the court could rely on father's connection to Vermont in his capacity as a parent where he had not been legally recognized as a parent for two reasons. First, regardless of parentage, father was a significant connection that mother had to Vermont insofar as the two had a long history together and mother had resided with father for at least part of her pregnancy. Second, given their history, father's situation and information about his relationship with mother was important evidence relevant to the child's future welfare.

11

evidence in Vermont about parental fitness provided a sufficient basis for Vermont to exercise jurisdiction. See In re A.W., 2014 VT 32, ¶ 24 (holding that Vermont had sufficient ties to exercise jurisdiction where father and child resided in Vermont with paternal grandparents and father had applied for benefits in Vermont, had retained Vermont driver's license and vehicle registration, and had engaged in safety plan with DCF).

### C. Communication with New Hampshire

¶ 22. Mother also argues that the family court abused its discretion in failing to contact and communicate with New Hampshire prior to exercising jurisdiction. The section of the UCCJEA upon which mother relies is entitled "Communication between courts." 15 V.S.A. § 1068.

¶ 23. In construing this provision, we look first to the plain language of the statute, which states: "A Vermont court may communicate with a court in another state concerning a proceeding arising under this chapter." Id. The provision's use of "may" indicates communication is an option, but not a requirement. See Town of Calais v. Cty. Rd. Comm'rs, 173 Vt. 620, 621, 795 A.2d 1267, 1268 (2002) (mem.) ("The plain, ordinary meaning of the word "may" indicates that a statute is permissive, not mandatory."). This conclusion is made even more plain by the fact that the statute elsewhere uses "shall" to indicate that communication is required. See 15 V.S.A. § 1076(b) ("If the court determines that a child custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this chapter, the Vermont court shall stay its proceeding and communicate with the court of the other state." (emphasis added)). The comment to the uniform law on which the statute is based explains that communication is authorized by the provision at issue here, but it is not required. U.L.A. Child Custody Jurisdiction and Enforcement Act § 110 cmt. (1997); see Rosen v. Rosen, 664 S.E.2d 743, 751 (W. Va. 2008) (holding that because UCCJEA "does not expressly require interstate court communication

concerning these types of proceedings, we simply cannot find that the circuit court committed any error in declining to require the family court to have direct verbal communication with the Ohio common pleas court before taking jurisdiction of the case").

¶ 24.  Moreover, there was no conflict between states to resolve.  At the hearing on the motion to dismiss, an employee of DCYF, who had been working with mother since 2012, testified that there was no pending case in New Hampshire for M.S. and if Vermont determined it did not have jurisdiction, then New Hampshire would file for custody.  Given that there was no pending court proceeding in New Hampshire and no open child-protection case there, there was no conflict between Vermont and New Hampshire and the court did not abuse its discretion in declining to contact New Hampshire.  See In re C.P., 2012 VT 100, ¶ 26, 193 Vt. 29, 71 A.3d 1142 (explaining that one main purpose of uniform law is to avoid conflict between states and no conflict arises when proceedings are ongoing in only one state).

## II.  Father's Appeal

¶ 25.  We turn next to father's appeal.  Father first contends that DCF failed to timely request genetic testing to identify him and that the court erred in proceeding with the merits hearing in his absence.  He also argues that the court erred in taking judicial notice of the New Hampshire termination decisions involving his two eldest children.

### A.  Father's Identification and Absence at Merits

¶ 26.  The record reveals the following facts related to father's involvement in the case. Father was named in the initial CHINS petition, was noticed of the hearing, and was present with an attorney at the initial hearing on January 14, 2015, which took place after DCF filed for an emergency care order and mother moved to dismiss it.  At that hearing, the court inquired whether father had signed an acknowledgement of parentage at the time of the child's birth or shortly thereafter and father's attorney answered that he had not.  The court further inquired whether

13

mother would agree that father was the biological parent of M.S. and mother's attorney indicated that mother would not make that acknowledgement.

¶ 27.   The following exchange then took place:

THE COURT: Okay, then he's not the father and he's out.

[Mother's attorney]: I understand that, Your Honor.   And that's why [mother] is not making a statement at this time.

THE COURT: Okay.  So [father's attorney]?

[Father's attorney]: Oh, yeah. Since –

THE COURT: See you.

[Father's attorney]: Yeah.  Since it's rendered moot, yeah.

THE COURT: You do not have standing.  You do not have any involvement in this case until there's a finding that [father] is the father of this child.  So further discussion today will be—that doesn't mean we're done with the case though.  It just means [father's attorney] and [father] should remove themselves from the courtroom now.  Quickly.

It appears from the transcript that father and his attorney left the proceeding at that time.  Neither challenged the court's order or made any attempt to claim father's paternity.

¶ 28.   Later in the hearing, the court inquired whether the court should order genetic testing of father and mother's attorney indicated that mother was not requesting genetic testing and was not willing to name the putative father.  The court directed DCF to make diligent efforts to identify the child's biological parent.  At a subsequent hearing on mother's motion to dismiss, mother testified that father was probably M.S.'s biological parent, but that it could be another man. She would not provide the other person's name or where he lived.

¶ 29.   In April 2015, the State filed a motion requesting an order for genetic testing.  As an exhibit, the state attached two letters DCF previously sent to father attempting to set up voluntary genetic testing in February and March 2015.   Father did not appear for either

appointment. The court granted the State's motion and issued an order for genetic testing. Based on the results, and following a period for the parties to object, the court issued a parentage order in June 2015. The merits hearing on the CHINS petition was heard over two days in May and July 2015. Father did not participate in the first day of the hearing, which occurred prior to the order identifying him as a parent. After father was identified, he was given notice of hearings and participated in the second day of the merits hearing. At the close of the hearing, the court indicated that father could challenge any evidence from the merits proceeding that was being relied upon at disposition. Father made no objection at that time.

¶ 30. Pursuant to statute, where a parent has not been identified, the court can order genetic testing of "the alleged father." 33 V.S.A. § 5111(a). Further, when a child is placed in DCF custody, DCF must "make reasonably diligent efforts to locate a noncustodial parent as early in the proceedings as possible," but hearings are not delayed even if the noncustodial parent is not located. Id. § 5111(b). The statute explains that all parties have a right to present evidence at the merits hearing. 33 V.S.A. § 5315(c). Nonparties may not be present and offer evidence.

¶ 31. On appeal, father first argues that the court erred in not ordering genetic testing earlier in the proceedings. We agree that the court was in error in failing to order genetic testing of father following the initial hearing on the CHINS petition. Here, where mother and father had three prior children together, they were living together prior to this child's birth, and father was named by DCF in the CHINS petition and appeared at the initial hearing, father qualified as an "alleged father" within the meaning of the statute. To clarify father's status as quickly as possible, the court should have issued an order for genetic testing. This would have avoided unnecessary delay in the determination of paternity, whatever the reasons for mother's position on the paternity issue might have been.

15

¶ 32. The court's failure to order genetic testing at the initial stages of the proceeding does not require reversal, however, because father fails to demonstrate how his lack of participation in the first day of the merits proceeding resulted in prejudice to him. "The focus of a CHINS proceeding is the welfare of the child, and therefore a court may adjudicate the child as CHINS even if the allegations are established as to one parent but not the other." In re C.P., 2012 VT 100, ¶ 28. The merits proceeding in this case properly focused on M.S. Based on the evidence presented, the court found that M.S. lacked proper parental care relative to mother, who was the custodial parent, and indeed, the only parent identified at that time. The court was not required to make a separate finding as to father. See id. (explaining that CHINS decision determines issues about child's welfare and can form basis for termination petition against father even if allegations are not directed at father). Further, the court explained at the end of the second day of the merits hearing that father would have an opportunity to challenge any evidence presented at merits that was going to be used at disposition. This fully protected father's interest at the disposition stage. See In re B.R., 2014 VT 37, ¶¶ 13-14, 196 Vt. 304, 97 A.3d 867 (explaining that CHINS proceeding focuses on child's welfare and parent's fitness becomes relevant at disposition).

¶ 33. Father also contends that the failure to identify him earlier in the process violated his due process rights. Because we conclude that father's lack of participation in the CHINS proceeding does not require reversal of the merits adjudication and because his due process rights were protected at disposition, we need not consider the extent of his interests prior to disposition.

B. Termination Orders Concerning Older Children

¶ 34. Finally, father argues that the court erred in taking judicial notice of the New Hampshire termination of parental rights orders concerning the parties' two eldest children. Father asserts that while the court could take judicial notice of the fact of the orders, it could not rely on substantive findings in those orders. We conclude that there was no error.

16

¶ 35. The record reveals that the court did not take judicial notice of the termination orders, but admitted them into evidence. At the disposition hearing, the State offered the orders as exhibits. Father's attorney objected to the court taking judicial notice of the orders. The court explained that it was not taking judicial notice, but admitting the orders, and father's attorney agreed that the orders were admissible. Insofar as father did not object, he has not preserved any argument for appeal to challenge their admission. See In re C.H., 170 Vt. 603, 604, 749 A.2d 20, 22 (2000) (mem.) (explaining that parent must raise issue below to preserve it for appeal).

¶ 36. Furthermore, the court did not rely on the substantive findings in those orders to support its own conclusions. The court referred to the New Hampshire termination orders and recounted that court's findings regarding the conditions that led to the children being removed from parents' care and parents' failure to take significant steps to correct those conditions. The court did not, however, rely on any of those findings to support its own conclusions in this case. Therefore, we need not determine whether such reliance would have been appropriate in this case.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 37. **ROBINSON, J., concurring.** Without explicitly saying so, the majority essentially holds as a matter of law that a child born in a hospital generally does not have a home state until he or she sleeps in a bed outside the hospital. Its analysis in support of this conclusion leaps from an uncontroversial legal assertion supported by the language of the statute and the cases the majority cites to the far more questionable holding that I challenge. I don't believe this analysis is supported by a sensible interpretation of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) or the cases relied upon by the majority, and the majority's approach

17

has negative real-world ramifications. I agree with the outcome of the majority's analysis not because, as a matter of law, a child in the hospital has no home state, but because in this case the evidence supports the trial court's conclusion that, on account of his mother's lack of an established home at the time of his birth, this newborn child had no home state. For these reasons, I concur in the judgment, but not in the majority's analysis of the jurisdictional question.[8]

¶ 38.    The majority's holding rests on the partly explicit, partly implicit conclusion that a newborn child in the hospital has no home state. The majority concludes that, because this child was born in a hospital in New Hampshire, Vermont cannot be the child's home state as a matter of law, ante, ¶ 15, apparently even if the child has two parents who live together in Vermont, have lived together in Vermont for years, and plan to bring the child home to the newly decorated nursery in their home in Vermont that has been awaiting that child's arrival. In deciding that the child has no home state at all, the majority also concludes that New Hampshire is not the child's home state. It rests this conclusion in part on authority supporting the proposition that the child's birth in a New Hampshire hospital is not in itself enough to confer home state jurisdiction on New Hampshire. Ante, ¶ 14. But the Court goes further. In determining that New Hampshire is not the child's home state, the Court implicitly concludes that evidence about mother's living situation in the months leading up to the child's birth and mother's intent regarding where she and the baby would live after the child's birth, are not legally relevant. See ante, ¶ 13. Without explanation, the Court concludes that even though the child was born in New Hampshire, New Hampshire cannot be the child's home state even if mother had a long-established home in New Hampshire

---

[8] I concur fully in the majority's analysis and judgment with respect to father's arguments concerning the trial court's failure to immediately order genetic testing of father and references to the New Hampshire termination of parental rights orders.

18

to which she planned to return with the child.[9]  Because the child is a newborn, and still in the hospital, the majority implicitly reasons, he has no home state.[10]

¶ 39.  The unremarkable proposition underlying the majority's analysis is that under the UCCJEA, courts should look at where a child has actually lived, rather than where a parent asserts an intent to reside, in determining a child's home state.  This statement of law is squarely supported by the language of the UCCJEA.  See 15 V.SA. § 1061(7) (defining "home state" as "the state in which a child <u>lived</u> with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding" and, for a child less than six months of age, as "the state in which the child <u>lived</u> from birth with any of the persons mentioned" (emphasis added)).

¶ 40.  And this is the critical holding in the vast majority of cases cited by the majority in support of its analysis.  See, e.g., <u>Ocegueda v. Perreira</u>, 181 Cal. Rptr. 3d 845, 856-57 (Ct. App. 2015) (holding that where pregnant mother who lived and worked in California traveled to Hawaii to give birth, and then lived with child in Hawaii for six weeks, Hawaii, and not California, was child's home state); <u>Slay v. Calhoun</u>, 772 S.E.2d 425, 429-30 (Ga. Ct. App. 2015) (holding that, where child traveled back and forth between mother's home in Florida and unadjudicated Georgia father's homes during six month period preceding father's parentage action, Georgia was child's home state because child spent more time in Georgia during that time); <u>Powell v. Stover</u>, 165

---

[9]  The logic of the majority's analysis is somewhat inconsistent.  In rejecting Vermont as the child's home state, as a matter of law, the majority emphasizes the fact that the child was born in a New Hampshire hospital and has not been "physically present" in Vermont.  <u>Ante</u>, ¶ 15.  But in rejecting New Hampshire as the home state, the majority asserts that the child's physical presence in New Hampshire on account of being born in a New Hampshire hospital is irrelevant.

[10]  The majority suggests that some cases may exist in which a child in the hospital does "live with" a parent in that state, and thus has a home state.  But its analysis clearly rests on the proposition that a child in the hospital "lives" in that hospital—a conclusion I reject for the reasons set forth below.

19

S.W.3d 322, 326 (Tex. 2005) (holding that where mother and father moved from Texas to Tennessee with child for period of ten months, and then mother returned to Texas with child and initiated custody action, mother's asserted subjective intent to return to Texas all along did not make Texas child's home state because child had actually lived in Tennessee for preceding ten months); In re Marriage of Miller & Sumpter, 196 S.W.3d 683, 691-92 (Mo. Ct. App. 2005) (holding that under predecessor Uniform Child Custody and Jurisdiction Act, where children lived in Virginia for well over six months preceding initiation of custody proceeding, Virginia was their home state notwithstanding fact that mother, who was in the military, listed Missouri as her permanent residence and intended to retire there), abrogated on other grounds by Hightower v. Myers, 304 S.W.3d 727, 733 (Mo. 2010) (en banc).  I do not dispute this aspect of the majority's analysis.  If this were a case in which a parent was arguing that a state had home state jurisdiction due to a parent's subjective intentions, even though the parent and child had not actually lived in that state, these cases would be apt and persuasive.

¶ 41.   These decisions do not support the majority's suggestion that an infant in the hospital does not actually "live" anywhere.  In distinguishing where a child lives from a parent's claimed legal residence based on that parent's intent, these courts emphasized the child's physical presence in a state, as contrasted with a parent's intentions as to the child's domicile, as the touchstone for determining a child's home state.  See, e.g., Ocegueda, 181 Cal. Rptr. 3d at 851 (concluding that child's "physical presence in Hawaii from birth until the day before commencement of the proceedings means the child 'lived' in Hawaii for purposes of determining home state jurisdiction under the UCCJEA" (emphasis added)); Powell, 165 S.W.3d at 328 ("[I]n determining where a child lived for purposes of establishing home-state jurisdiction, the trial court must consider the child's physical presence in a state." (emphasis added)).  However, these cases all involved circumstances in which a child had lived in—was physically present in—a state

outside of the hospital beyond the period incident to the birth. None purport to address the status of a newborn in a hospital moments after birth. In relying on the "physical presence" language in these decisions to conclude that a newborn child in the hospital has no home state as a matter of law, without regard to the evidence concerning the child's parents' living situation, the majority stretches the language in these cases far beyond their actual holdings.

¶ 42. This more controversial prong of the majority's analysis—in which the majority holds that this child had no home state upon initiation of this custody action because the newborn child was in the hospital and thus did not "live" in Vermont or New Hampshire—is not supported by the language or purpose of the UCCJEA, nor the handful of decisions the majority cites that actually address this more challenging issue.

¶ 43. Nothing in the language of the UCCJEA supports the notion that a newborn child in a hospital does not "live" anywhere. The UCCJEA defines a child's home state with reference to where a child has "lived." 15 V.S.A. § 1061(7). In the context of the cases above, it makes sense to equate "living" with "physical presence," because those cases involve a parent invoking an intent to reside somewhere other than where the children have actually been spending their days and nights in order to claim an intended home state for the children. But the statute does not use the term "physical presence" and includes no language suggesting that a newborn child in a hospital does not live anywhere, even if the child has two parents who have for a long time lived together in a single state in a home to which they plan to bring their newborn child upon discharge from the hospital.

¶ 44. Nor does the purpose of the UCCJEA support such a reading. One of the main features of the UCCJEA relative to its predecessor, the UCCJA, is that it prioritizes "home state" jurisdiction above the alternate bases of jurisdiction for an initial custody determination. 15 V.S.A. § 1071. This was a deliberate change from the UCCJA, which authorized four independent bases

21

for establishing jurisdiction without prioritizing among them. See U.L.A. Child Custody Jurisdiction and Enforcement Act § 201 cmt. (1997); see also Ward v. LaRue, 2016 VT 81, ¶ 17, __ Vt. __, 150 A.3d 631. The prioritization of home state jurisdiction in the UCCJEA aligns the UCCJEA with the enforcement provisions of the federal Parental Kidnapping Protection Act (PKPA) and eliminates problems that arise when courts in different states simultaneously exercise jurisdiction in child custody cases. U.L.A. Child Custody Jurisdiction and Enforcement Act § 201 cmt. (1997); see also Powell, 165 S.W.3d at 325. By prioritizing home state jurisdiction, the UCCJEA reduces the number of potential disputes between competing jurisdictions. An interpretation that narrows the scope of home state jurisdiction, or makes it less predictable, has the opposite effect of increasing the possibility of jurisdictional disputes in competing jurisdictions. See Stephens v. Fourth Judicial Dist. Court, 2006 MT 21, ¶ 13, 128 P.3d 1026 (explaining that interpretation that had effect of narrowing home state jurisdiction "would increase the number of potentially conflicting jurisdictional disputes in competing jurisdictions"—a result that "conflicts with the UCCJEA's purpose"); Powell, 165 S.W.3d at 326 ("We believe that the UCCJEA should be construed in such a way as to strengthen rather than undermine the certainty that prioritizing home-state jurisdiction was intended to promote . . ."). An interpretation that would render home-state jurisdiction inapplicable during the brief period of time when a child born in the hospital remains in the hospital after birth would greatly diminish the certainty and clarity the UCCJEA seeks to promote.

¶ 45.  The main case relied upon by the majority that addresses the status of newborn babies in the hospital expressly contradicts the majority's actual holding. In re D.S., 840 N.E.2d 1216 (Ill. 2005). In In re D.S., a mother who resided in Illinois was driving to Tennessee, where the father lived, when she went into labor en route. She delivered at a hospital in Indiana. Illinois child protection officials initiated a custody proceeding involving the child in Illinois. The Illinois

22

Supreme Court upheld the trial court's significant connection jurisdiction after concluding that the child had no home state. The court rejected mother's argument that the child's brief stay in an Indiana hospital vested Indiana with home state jurisdiction, explaining:

> By itself, a temporary hospital stay incident to delivery is simply insufficient to confer "home state" jurisdiction under the UCCJEA. Again, the best indication of legislative intent is the statutory language, given its plain and ordinary meaning. Section 102(7) defines a newborn's home state as the state in which he or she has "lived from birth" with his or her parents. The crucial question, of course, is what did the drafters of the UCCJEA mean by "live," a verb that can mean many different things depending upon the context. Did they mean, as respondents seem to suggest, nothing more than "to be alive"? That, for purposes of the UCCJEA, a child "lives" in every jurisdiction in which he or she draws a breath? Or did they mean, as the case law teaches, something more like "to occupy a home"? We are convinced that they meant the latter. When people speak of where a mother and newborn baby "live," they do not speak of the maternity ward. Instead, they speak of the place to which the mother and baby return following discharge from the hospital. In many parts of Illinois, the mother's hospital of choice may be located in another city or even another state. Hoopeston mothers, we now know, may deliver in Champaign. Galena mothers may deliver in Dubuque. Yet no one would respond "a hospital in Champaign" or "a hospital in Dubuque" if asked where these mothers and babies live. Rather, they would respond "Hoopeston" or "Galena" because that is where these mothers and babies "live," as that term is commonly understood.
>
> As importantly, allowing a temporary hospital stay to confer "home state" jurisdiction would undermine the public policy goals of the UCCJEA, which include ensuring that "a custody decree is rendered in that State which can best decide the case in the interest of the child." Consider, again, a Galena mother who chooses to deliver her baby in a Dubuque hospital. In addition to living in Illinois, this mother may work in Illinois, have a husband and other children in Illinois, pay taxes in Illinois, attend church in Illinois, and send her children to Illinois schools. Clearly, if the occasion arose, Illinois would be the state "which can best decide" a case involving the interest of this mother's children. Yet, if respondent is correct, and a mere hospital stay is sufficient to confer home state jurisdiction under the UCCJEA, Iowa would possess exclusive jurisdiction over this newborn, based solely on the location of the obstetrician's practice. Such formalism turns the UCCJEA on its head, conferring jurisdiction on a state with a de minimis interest in the child, to the exclusion of the only state that could conceivably

23

be called the child's "home." We refuse to endorse this interpretation.

Id., 840 N.E.2d at 1222-23 (footnotes, quotations, and alterations omitted). The court concluded that the child had no home state not merely because the child was still in the hospital at the time child protection workers initiated the proceedings in Illinois, but also because mother's own testimony established that she had no connection to Indiana and no intention of remaining there following the child's birth, and that "she [was] a longtime resident of Illinois who, fearful of losing custody of [the child], intended to move to Tennessee." Id. at 1223. The In re D. S. court's analysis does not support the suggestion that a child born in the hospital has no home state, and fully supports the proposition that evidence concerning the parent or parent's living arrangement and intentions with respect to the child are highly relevant in determining the home state of a newborn child in the hospital.

¶ 46. Similarly, In re R.L., 208 Cal. Rptr. 3d 523 (Cal. Ct. App. 2016) does not support the position the majority has taken. In that case, the court considered a mother who had lived alternately in Tijuana, Mexico and Las Vegas, Nevada for the three years prior to the child's birth. She crossed into San Diego County for the purpose of giving birth to the child. Due to positive drug tests for herself and her child, child protection officials took the child into custody and asserted that California courts had jurisdiction to conduct an initial custody proceeding. The appeals court rejected this argument on the ground that, although the mother told the social worker she would like to stay in the San Diego area, "a parent's subjective intent to change residence does not determine where the child 'lived from birth.' " Id. at 534. The critical fact in this case was that the mother did not live in California prior to the child's birth, and the critical holding was that her subjective intent to begin living in the state following the child's birth was insufficient to create home state jurisdiction under those circumstances. The court's decision does not suggest that if

mother had actually relocated to and lived in California prior to giving birth in that state, California still would not have home state jurisdiction.

¶ 47.   To the extent it is relevant, In re Adoption of Baby Girl B., a case interpreting the UCCJA as opposed to UCCJEA, is likewise unhelpful to the majority's argument.  867 P.2d 1074 (Kan. Ct. App. 1994), superseded by statute, K.S.A. 59-2127, as recognized in In re Adoption of H.C.H., 304 P.3d 1271, 1280 (Kan. 2013).  In that case, biological parents who were expecting a child initially lived in Pennsylvania with their own respective parents.  The young mother-to-be moved to Kansas in September 1992 to live with her uncle and attend high school.  She was unable to attend high school right away due to a medical issue.  The child was born a couple of weeks later in Kansas.  The next day, proposed adoptive parents who resided in Michigan petitioned the Kansas court for adoption and termination of the legal parents' rights.  The child returned with them to Michigan upon discharge from the hospital, and the mother returned to Pennsylvania to finish the school semester a few days later.  She returned to Kansas at the end of the semester.  The mother consented to the adoption but the father did not.  At issue before the Court of Appeals of Kansas was whether Kansas had jurisdiction.  Concluding that the UCCJA applied to adoption proceedings, the court concluded that Kansas was not the child's home state.  The court reasoned:

> The requirement that the child "live with" the mother from birth requires more than the mother and newborn child staying at the same hospital for a brief period.  When considering a similar provision in the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (1988), the court in Rogers v. Platt, 641 F.Supp. 381, 386 (D.D.C. 1986 stated, "[T]o 'live with' someone requires a deliberate manifestation to share a common place with the person during a substantial period of the time involved.  Since an infant cannot make such a manifestation, the Court must look to the mother in this situation."  The court in Rogers went on to conclude that, where the mother never saw the child after birth, signed a release permitting the hospital to give other individuals temporary custody of the baby a few hours later, and left the hospital without the child, the court could not conclude the child lived with the mother from birth.  Here, the record is insufficient to support a finding that the child lived with

the mother in Kansas from birth. Kansas was not the child's home
state when the adoption proceedings were commenced.

867 P.2d at 1079-80 (emphasis added). In considering whether Kansas was the child's home state, the court did not conclude that as a matter of law the child had no home state while still in the hospital. Instead, the court looked to the evidence concerning mother's own living situation and intentions with respect to the child. Id. at 1080.

¶ 48. For the above reasons, the proper interpretation of "lived with" in the definition of "home state" in the UCCJEA, as applied to a newborn child in the hospital, requires consideration of the mother's living situation and intentions at the time of the child's birth. Although a mother cannot intend her way out of an actual living situation—that is, she cannot confer home state jurisdiction on a state where she does not actually live by declaring an intention to begin living there prospectively—when a mother lives in a single state with no intention to relocate at the time of the child's birth, and plans to return to that home with the child upon discharge from the hospital, the mother and child live in that state from the moment the child is born, whether or not they are still in the hospital.

¶ 49. The issue here is not merely academic; the majority's approach broadly expands the number of states that may assert jurisdiction to adjudicate the custody of newborn children who, through their parents, other adults, or various circumstances, have potential ties of varying degrees to multiple states. If a newborn child in the hospital has no home state, then any state with a significant connection can assert jurisdiction to make an initial custody determination. See, e.g., 15 V.S.A. § 1071(a)(2) (providing that Vermont court may assert jurisdiction when no other court has jurisdiction if child and at least one parent has "significant connection with Vermont"). This is true whether the child is born in Vermont or New Hampshire, and whether the parents have an established residence in one state or the other. The significant connection required to support jurisdiction need not be the most significant or strongest connection. Pierce v. Slate, 2017 VT 63,

26

¶ 23, __ Vt. __, __ A.3d __.  State child protection agencies from any state with a significant connection to a child and the child's parent may ask that state's courts to initiate a custody proceeding at the time of the child's birth.  The court in the state where the first state agency files would maintain jurisdiction subject only to the court's discretion to decline to exercise jurisdiction in deference to another state.  See 15 V.S.A. § 1076(a) (establishing first-in-time rule, where multiple states have jurisdiction); 15 V.S.A. § 1077 (providing that court with jurisdiction may decline to exercise jurisdiction).[11]

¶ 50.  I agree with the outcome of the majority's analysis not on the basis of an across-the-board rule about newborns in the hospital, but because in this case the evidence supports the trial court's conclusion that, on account of mother's lack of an established home at the time of the child's birth, this newborn child had no home state.  After an evidentiary hearing, the trial court found that in the late winter months of 2014, mother moved out of her trailer in Vermont, and the home became uninhabitable due to burst pipes.  Through 2014 mother continued to give the address for that trailer to New Hampshire and Vermont social service providers.  Mother was essentially homeless for several months in 2014, living with her own mother, at friends' houses, with her brother, with father at his parents' house in Vermont, and with relatives in New Hampshire.  Mother lived with her grandparents in New Hampshire in December 2014, but that arrangement was short-lived.  She was staying with her mother and her mother's cousins in a different New Hampshire town shortly before the child's January 12, 2015 birth.  She testified that

---

[11]  I don't see anything in the court's analysis that limits its holding to cases in which a child is born in a different state from where the parents live and plan to bring the child upon discharge from the hospital.  If physical presence in the hospital does not confer jurisdiction, and the parents' own living arrangements and intentions are irrelevant, then no child in the hospital has a home state.  Even if the holding were somehow limited to children born in states other than where the parents live, it would still have broad and harmful effects.  For example, a large number of Vermonters up and down the Connecticut River Valley cross the river into New Hampshire for their medical care, including to give birth.

she intended to remain in New Hampshire for the foreseeable future, and acknowledged that she spends nights in some other locations at times, including with the father in his home in Vermont. These findings were supported by the evidence, and are unchallenged on appeal. They support the trial court's conclusion that mother was homeless, and had lived in multiple different residences over the several months prior to the child's birth. The court properly rejected mother's argument that her claimed subjective intent to stay in New Hampshire was sufficient to convey home state status on New Hampshire under such circumstances, especially when, as the court noted, "the evidence strongly suggests that she was trying to avoid the attention of Vermont DCF, so that [the child] would not be placed in Vermont custody." The trial court properly considered whether mother actually lived in New Hampshire or Vermont, at the time of the child's birth, and its conclusion that she did not supports its determination that the child has no home state under the UCCJEA. For these reasons, I concur in the court's judgment only.

_____
Associate Justice


¶ 51.   **TEACHOUT, Supr. J., Specially Assigned, dissenting in part.**   I dissent only on the ruling that because father had the ability to participate in the last stage of the case, his due process rights were sufficiently protected. He was summoned into court as a named party in the petition, and as such he had the right to an opportunity to be heard as to his position on parentage at the temporary care hearing, which is a preliminary hearing on the petition. 33 V.S.A. § 5307(g). Instead he was summarily dismissed without an opportunity to even state a position or seek to have parentage established. The majority ruling seems to endorse the principle that a named party's due process right to a timely opportunity to be heard can be compromised as long as the person is brought into the case later. This ruling does not sufficiently protect the due process rights of fathers

28

in future cases as well as this one, nor the rights of children to have an opportunity for a relationship with their father that is timely in terms of their developmental needs.

¶ 52.    In a juvenile case, "all the parties involved are to be accorded a fair hearing, and their constitutional and other legal rights recognized and enforced." In re R.B., 152 Vt. 415, 421, 566 A.2d 1310, 1313 (1989) (quotation omitted).  The due process right of a named party father to be heard in a timely way is too important to be subject to possible compromise.  For some fathers, delay may mean denial of participation until too late, not only regarding hearings but also to be part of a case plan (due within sixty days of removal pursuant to 33 V.S.A. § 5314) and to participate in services to prepare for effective parenting.

¶ 53.    The process by which father's parental rights were terminated was procedurally flawed when, as a named party, he was not given a timely opportunity to be heard on the petition. I would reverse as to father and remand for a new disposition case plan and hearing with respect to father.  I concur on all other issues in the majority opinion.


_____

Superior Judge, Specially Assigned